**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Jane Doe, John Doe, and Minor Doe, by and through his Legal Guardians, Jane Doe and John Doe,

Plaintiffs,

v.

Osseo Area School District, ISD No. 279,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 17-1223 ADM/DTS

---

Andrea L. Jepsen, Esq., School Law Center, LLC, St. Paul, MN, on behalf of Plaintiffs.

Peter A. Martin, Esq., Knutson, Flynn & Deans, PA, Mendota Heights, MN, on behalf of Defendant.

---

## I. INTRODUCTION

On September 14, 2017, the undersigned United States District Judge heard oral argument on Defendant Osseo Area School District, ISD No. 279's ("Osseo" or the "School District") Motion for Summary Judgment [Docket No. 17], and Plaintiffs Jane Doe, John Doe, and Minor Doe, by and through his Legal Guardians, Jane Doe and John Doe's (collectively, "Plaintiffs") Motion for Summary Judgment [Docket No. 33]. For the reasons set forth below, Plaintiffs' Motion is denied and Defendant's Motion is granted.

## II. BACKGROUND

### A. Graffiti Discovered on November 9, 2016

Around 12:45 p.m. on November 9, 2016, a student discovered racist graffiti written in whiteout on an inside stall door and toilet paper dispenser in a boys' bathroom at Maple Grove Senior High (the "School"). Vernig Decl. [Docket No. 19] ¶ 3; Kenney Decl. Ex. 1 [Docket No.

25] ("Hr'g Tr.") at 46:2–8. The graffiti included "#Gobacktoafrica," "#whitesonly," "#whiteamerica," and other racist, hostile phrases. Vernig. Decl. ¶ 3.

Assistant Principal Naida Grussing-Neitzel ("Grussing-Neitzel") learned about the graffiti from a student management specialist. Hr'g Tr. 127:11–13. Grussing-Neitzel directed that the bathroom with the graffiti be locked, and that the rest of the school's bathrooms and locker rooms be checked for possible graffiti. Id. 129:13–130:3.

The presence of the graffiti spread quickly among the students through social media causing significant tension. Id. 130:14–20; 217:10–17. The School staff was fully occupied responding to distraught and concerned students. Id. 130: 7–12. The School was also fielding an "avalanche of calls" about the graffiti, including over 19 media inquiries within a few hours after the graffiti was discovered. Id. 130:7–20; 217:25–218–3; 258:3–15.

**B. The School's Investigation**

Because of the large number of black students enrolled at the School, Grussing-Neitzel determined that the graffiti posed a student safety issue. Id. 130:21–131:4. She quickly initiated an investigation to discover the responsible student. Id. 131:5–8.

After reviewing the security camera footage, Grussing-Neitzel and her administrative team surmised the graffiti had to have been written between 11:18 a.m. and 12:05 p.m. Id. 132:2–133:12. The security footage was also used to identify students who were in the bathroom for an extended period of time between 11:18 a.m. and 12:05 p.m. Id. 131:22–132:1. The film review led the investigation to focus on two suspects, Plaintiff Minor Doe was one of those suspects. Id. 136:6–19.

Grussing-Neitzel and another assistant principal interviewed Minor Doe the following

afternoon. Id. 144:11–23. Minor Doe explained his presence in the bathroom on the security film by saying he left class and went to the bathroom to address a bloody nose. Id. 144:25–145:2. Minor Doe denied going into the stall where the graffiti was written, claiming that he stayed in front of the large mirror by the sinks the entire time he was in the bathroom. Id. 145:18–147:3. Minor Doe then allowed Grussing-Neitzel to search his backpack. Id. 147:4–17. Grussing-Neitzel discovered that Minor Doe was carrying a whiteout pen and a purple binder with "K.L.U.R.P." written on it in whiteout. Id. 147:4–17. Minor Doe explained that "K.L.U.R.P." was a "PlayStation group" and that some of his female classmates in his fourth period English class wrote it on his binder. Id. 148:18–149:11. Grussing-Neitzel suspended Minor Doe for five days based on the information from the security footage and the items discovered in his backpack. Id. 152:4–12. During Minor Doe's suspension, the School's investigation continued. Id. 153:21–154:3.

Assistant Principal Josie Johnson ("Johnson") interviewed all of the girls in Minor Doe's English class to corroborate Minor Doe's story about "K.L.U.R.P." Id. 155:24–156:4. The girls all denied writing anything on Minor Doe's binder. Id. 156:7–10. Two or three girls reported seeing Minor Doe write with whiteout on folders during class. Id. 156:11–13.

Grussing-Neitzel, Johnson, and other School officials interviewed every student observed entering the bathroom between 11:18 a.m. and 12:13 p.m.[1] Id. 156:24–157:12. No student reported seeing another student in the bathroom with a bloody nose. Id. 231:2–9. Security footage also showed Minor Doe casually walking to bathroom without holding his nose, which

[1] The relevant time frame specified here differs slightly from the time frame discussed earlier for reasons immaterial to this Motion.

was contrary to Minor Doe's statement that he had to leave class in a hurry because he had a bloody nose. Id. 233:4–16. The School concluded that Minor Doe's story "fell apart." Id. 233:1–3.[2]

On Friday, November 18, the School determined that Minor Doe wrote the racist graffiti in the bathroom and initiated expulsion proceedings. Id. 159:9–160:11; 182:19–23; 260:19–262:8.

**C. Minor Doe**

In April 2016, approximately seven months before the graffiti incident, the School provided Minor Doe with an educational plan pursuant to Section 504 of the Rehabilitation Act. Doe Aff. Ex. 1 [Docket No. 37] ("Section 504 Plan"). Minor Doe has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Major Depressive Disorder, and Post Traumatic Stress Disorder. Id. His Section 504 Plan states that he lacks confidence in his academic abilities and struggles with self-advocacy and organization. Id. The Section 504 Plan accommodates Minor Doe by: 1) scheduling his classes in a manner to ensure continuity of teachers, 2) having a counselor check-in to provide academic support, 3) providing additional time to complete assignments, and 4) breaking down longer assignments into smaller parts. Id.

Minor Doe has not received services under the Individuals with Disabilities Education Act ("IDEA").

**D. The November 21, 2016 Meeting**

Because Minor Doe was a Section 504 student, the School District was required to follow

[2] The other student preliminarily identified as a suspect was also interviewed. After the interview, the School concluded that Minor Doe was solely responsible for the graffiti. Id. 159:10–160:11.

certain procedures prior to expulsion. On November 21, 2016, the School convened a meeting of Minor Doe's Section 504 Team to conduct a "Section 504 Manifestation Determination." Emmons Decl. [Docket No. 20] Ex. 1. The purpose of the meeting was to determine whether "Minor Doe's conduct was caused by Minor Doe's Section 504 disabilities." Emmons Decl. ¶ 4.

Kate Emmons ("Emmons"), the School District's Director of Student Services, directed the meeting, which was attended by Minor Doe's guardians and their attorney, the School's Principal and Assistant Principal, Minor Doe's math teacher, a School counselor, and the School District's legal counsel. Emmons Decl. ¶ 5. The School principal reviewed the disciplinary incident, explaining that Minor Doe committed vandalism and violated racial harassment policies by using whiteout to write racial slurs in a boys' bathroom. Id. ¶ 7. The group then reviewed and discussed Minor Doe's: 1) Section 504 Plan; 2) diagnostic report from a therapist working with him; 3) his overall academic performance; 4) classroom observations from his math teacher; 5) current graduation requirements; and 6) background before being enrolled at the School. Id. ¶ 9.

After reviewing this information, the School personnel determined that Minor Doe's disabilities as identified on his Section 504 Plan did not cause him to write the racist graffiti in the bathroom. Id. ¶ 10. Minor Doe's guardians and their attorney disagreed with that determination and believed that Minor Doe's disability was the cause of the misconduct. Id.

Shortly after the meeting, District-Level Principal Sara Vernig ("Vernig"), who was not present for the meeting itself, and the School District's attorney met with Minor Doe's guardians and their attorney. Vernig Decl. ¶ 6. Vernig explained that because of the determination that Minor Doe's behavior was not a manifestation of his Section 504 disabilities, she needed to

discuss the discipline-related options available to Minor Doe's guardians. Id. ¶ 7. Vernig offered several options to Minor Doe's guardians to avoid expulsion proceedings. Id. ¶¶ 8, 9. Minor Doe's guardians did not agree to any of the proposed options, but continued to challenge the School's conclusion that Minor Doe engaged in the offensive conduct. Id. ¶ 10. At the end of this meeting, Minor Doe's guardians requested the School District send them the expulsion hearing notice so they could evaluate whether to accept one of the School District's offers of alternative educational services at another secondary school. Id. ¶ 10.

**E. The December 20, 2016 Expulsion Hearing**

The School District sent an expulsion hearing notice to Minor Doe's guardians on December 1, 2016. Id. ¶ 12. Prior to the hearing, Minor Doe's guardians did not agree to the School District's offers to avoid expulsion, insisting that Minor Doe be allowed to return to School. Id. Due to the severity of the incident and it causing school-wide disruption as well as concerns for Minor Doe's safety, the School District did not permit Minor Doe to return to School. Id.

The expulsion hearing was held on December 20, 2016, before an independent hearing officer. Id. ¶ 13; Hr'g Tr. 1:8–12. The hearing officer heard testimony from 11 witnesses for the School District and received 30 exhibits, 29 of which were offered by the School District. Id. 3:7–4:19; 5:6–7:17. No witness testified on behalf of Minor Doe.

The hearing officer concluded that "there is no doubt that [Minor Doe] was responsible for writing the graffiti on the Maple Grove High School bathroom stall door and toilet paper dispenser." Kenney Decl. Ex. 3 [Docket No. 27] at 50. The hearing officer recommended that Minor Doe be expelled from the School for 12 months. Id. at 60.

## F. The School District Passes a Resolution Expelling Minor Doe

On December 27, 2016, the School District convened a special meeting of the School Board. Kenney Decl. Ex. 4 [Docket No. 28]. The School Board members present at the meeting unanimously agreed to expel Minor Doe for 12 months, effective December 7, 2016. Id. Minor Doe's guardians did not appeal the expulsion decision to the Minnesota Department of Education.

## G. The Lawsuit

The Amended Complaint [Docket No. 4] alleges that the School District violated Section 504 of the Rehabilitation Act by expelling Minor Doe "without first conducting a reevaluation of the kind specified in Section 504 of the Rehabilitation Act." ¶ 74. Plaintiffs further allege that the School District violated Minor Doe's rights under Section 504 of the Rehabilitation Act "by "applying an unlawfully high standard to determine whether Defendant was obligated to accommodate Minor Doe's disability." Id. ¶ 81.[3] Plaintiffs seek an order restoring Minor Doe's enrollment at the School.

Both parties have moved for summary judgment.

# III. DISCUSSION

## A. Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. On a motion for summary judgment, the court views the

[3] Plaintiffs additionally alleged that the School District violated Minor Doe's constitutional rights, but those claims have been withdrawn. See Mem. Opp'n [Docket No. 40] at 1.

evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). "[S]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenik, 47 F.3d at 959.

On summary judgment, "[t]he moving party bears the burden to demonstrate that there is no issue of material fact. The plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of 'specific facts creating a triable controversy.'" Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004) (quoting Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999)).

**B. Legal Framework**

Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits a federally-funded program from discriminating against a disabled individual solely by reason of that person's disability. 29 U.S.C. § 794(a). The parties do not dispute that the School District qualifies as a "federally-funded program," and that Minor Doe qualifies as a "disabled

individual."[4]

Section 504 does not guarantee any explicit procedural rights. Power ex rel. Power v. Sch. Bd. of City of Va. Beach, 276 F. Supp. 2d 515, 519 (E.D. Va. 2003). Instead, 34 C.F.R. § 104.36 requires qualifying educational facilities to

> establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.

34 C.F.R. § 104.36. Collectively, these protections are referred to as a "Section 504 hearing." K.U. v. Alvin Indep. Sch. Dist., No. 98-40203, 1998 WL 912198, at *1 & n.1 (5th Cir. Dec. 18, 1998) (unpublished); R.J. v. McKinney Indep. Sch. Dist., No. 05-257, 2005 WL 3576839, at *1 (E.D. Tex. Dec. 29, 2005).

Section 504 hearing protections can be complied with by use of the procedural safeguards of the IDEA. See 34 C.F.R. § 104.36 ("[c]ompliance with the procedural safeguards of section 615 of the Education of the Handicapped Act [now the IDEA][5] is one means of meeting [the Section 504 hearing] requirement.").

---

[4] The parties also appear to agree that Minor Doe's claims implicate the Americans with Disabilities Act ("ADA") despite the Amended Complaint reciting only the ADA in its jurisdictional statement. Am. Compl. ¶ 5. However, since the ADA is "similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable,'" the Amended Complaint's silence with regard to the ADA is immaterial. Wojewski v. Rapid City Reg'l Hosp., Inc., 450 F.3d 338, 344 (8th Cir. 2006).

[5] The Education of the Handicapped Act, Pub. L. No. 94–1142, codified at 20 U.S.C. § 1415, was the statutory predecessor to the IDEA.

Under the IDEA,

> (1) Within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the [local educational agency], the parent, and relevant members of the child's IEP Team (as determined by the parent and the [local educational agency] ) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—
>
> (i) If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
>
> (ii) If the conduct in question was the direct result of the [local educational agency's] failure to implement the IEP.

34 C.F.R. § 300.530(e). This determination is called a manifestation determination. Id.

**C. The November 21, 2016 Meeting Satisfied Section 504**

Plaintiffs argue that in the November 21, 2016 meeting, the School District considered only whether Minor Doe's behavior was caused by his disability, instead of whether it was related to or connected to his disability. According to Plaintiffs, the former standard is part of the IDEA, while the latter standard is part of Section 504 and the ADA. Plaintiffs contend that the School District's use of the higher "caused by" standard is not supportable and has no foundation in the law.

The School District argues that Section 504 does not set forth explicit procedural requirements for Section 504 students. Instead, Section 504 demands covered entities establish certain procedural guarantees, which may be satisfied by utilizing protections specified in the IDEA. The School District also argues that the causation standard it applied mirrors interpretive guidance issued by the Office of Civil Rights ("OCR"), the sub-agency of the U.S. Department of Education primarily responsible for protecting civil rights in education programs.

The standard applied by the School District comports with the standard used in other school discipline cases. For example, in the very similar case of J.M. v. Liberty Union High Sch. Dist., No. 2017 WL 2118344 (N.D. Cal. May 16, 2017), a student was eligible for a Section 504 plan due to his ADHD diagnosis. Id. at *1. The student was in an altercation with another student, and the school initiated expulsion proceedings. Id. The school district first considered whether the "conduct in the altercation was caused by or had a direct and substantial relationship to [the student's] ADHD." Id. (quotation marks omitted). The school district concluded that it did not. Id. In federal court, the student argued that the school violated Section 504 "by applying the incorrect legal standard in making a manifestation determination." Id. at *4. The student alleged that "the correct legal standard is not whether the student's behavior was caused by or had a direct and substantial relationship to his disability, . . . but simply whether the behavior bears a relationship to the disability." Id. The court rejected this argument by noting that the school's manifestation determination procedures mirrored the IDEA, and that 34 C.F.R. § 104.36 provides that compliance with the procedural safeguards of the IDEA is one way of satisfying the requirements of Section 504. Id. at *4–5.

Similarly, in Power, the school sought to expel a Section 504 student for bringing a pellet gun to school. 276 F. Supp. at 516–17. The school's guidelines provided that prior to disciplining a Section 504 student, the school had to determine "whether the behavior at issue resulted from the student's qualifying disability." Id. at 517. Although the causation standard was not directly being challenged like it is here, the court in Power observed that compliance with the procedural system set forth in the IDEA is one way of satisfying Section 504. Id. at 519 n.9.

In arguing for a less stringent standard, Plaintiffs cite cases involving workplace disability discrimination under the ADA, workplace discrimination under the Rehabilitation Act, and housing discrimination under the Fair Housing Act. See, e.g., Wood v. Crown Redi-Mix, Inc., 339 F.3d 682, 683 (8th Cir. 2003) (involving workplace discrimination under the ADA); Peebles v. Potter, 354 F.3d 761, 764 (8th Cir. 2004) (involving workplace discrimination under the Rehabilitation Act); Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 334 (2d Cir. 1995) (involving housing discrimination under the Fair Housing Act).

School discipline cases support the "caused by" standard applied by the School District. Further, the OCR has long utilized a causation standard that aligns with this standard. OCR has advised that, under Section 504, prior to implementing an exclusion that constitutes a significant change in placement, the first step is to determine "whether the misconduct is caused by the child's handicapped condition." OCR Memorandum - Long-Term Suspension of Expulsion of Handicapped Students, 307 IDELR 05 (OCR 1988). The OCR utilizes this "caused by" standard in its decisions. See, e.g., Prince William Cty. (VA) Pub. Schs., 68 IDELR 286 (OCR 2016) ("When a significant change in placement is for disciplinary reasons, the first step in the reevaluation is to determine whether the student's disability caused the misconduct."); E. Detroit Pub. Schs., 116 LRP 29008 (OCR 2015) (same).[6]

Plaintiffs dispute the persuasive force of the OCR decisions by arguing that they either conflict with controlling case law or they should not be afforded deference. Plaintiffs' attempt to sidestep OCR authority is unavailing. First, contrary to Plaintiffs' contention, the causation

[6] These decisions, as well as the OCR Memorandum - Long-Term Suspension of Expulsion of Handicapped Students, are Exhibits to the Martin Declaration [Docket No. 45].

standard for determining whether student misconduct was a manifestation of the student's disability is not imported from employment or housing discrimination cases. Plaintiffs do not cite any Section 504 student discipline case utilizing the causation standard they argue that the School District was required to apply. Second, the Supreme Court has held that an agency's interpretation of its own regulations is entitled to "substantial deference." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The OCR is the enforcement agency with the United States Department of Education tasked with ensuring that educational facilities receiving federal funds do not engage in discrimination. 20 U.S.C. § 3413; 34 C.F.R. § 104.1. The OCR enforces Section 504 through the regulations, as well as enforcing Title II of the ADA in education systems and institutions. See 28 C.F.R. § 35.190(a)(2). Therefore, the OCR decisions cited by the School District are entitled to at least some deference, further underscoring the legality of the causation standard used by the School District in the November 21, 2016 meeting. See United States v. Mead Corp., 533 U.S. 218, 234–35 (2001) (citing cases holding that reasonable agency interpretations merit at least some degree of deference).

In sum, the School District did not violate Section 504 by using a "caused by" standard in the November 21, 2016 meeting.[7]

---

[7] Plaintiffs additionally fail to explain why this case does not require proving that the School District acted in bad faith or with gross misjudgment. See B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist., 732 F.3d 882, 887 (8th Cir. 2013) ("We have consistently held that where alleged ADA and § 504 violations are based on educational services for disabled children, the plaintiff must prove that school officials acted in bad faith or with gross misjudgment." (quotation marks and alteration omitted)). The record does not reflect any bad faith or gross misjudgment by the School District.

**D. The District was not Required to Undertake a Complete Reevaluation Prior to Initiating Expulsion Proceedings**

Plaintiffs argue that the November 21, 2016 meeting failed to satisfy the reevaluation procedure Section 504 requires prior to initiating any significant change in placement. Plaintiffs contend that since expulsion is a "significant change in placement," the School District must have performed a reevaluation that satisfies the contours of 34 C.F.R. § 104.35(b). The School District responds that nothing in Section 504 or its implementing regulations expressly requires a full reevaluation under § 104.35 for a student subject to a disciplinary change of placement.

Under 34 C.F.R. § 104.35, the School District is required to perform

> an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement.

34 C.F.R. § 104.35(a). Subsection (b) requires the School District to "establish standards and procedures for the evaluation and placement of persons who, because of handicap, need or are believed to need special education or related services." Id. § 104.35(b).

As noted above, abiding by IDEA procedures is one approved method for complying with the requirements of Section 504. Under the IDEA, if a student who receives services violates a code of student conduct, and the subsequent disciplinary change in placement would exceed 10 consecutive school days, the school may discipline the student in the same manner as a non-services receiving student "if the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability." 34 C.F.R. § 300.530(c). Under this regulation, determining whether the behavior that gave rise to the violation is a

manifestation of the student's disability demands that the school, parent, and the relevant members of the child's IEP Team, "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents." Id. § 300.530(e)(1).

In Doe v. Board of Education of Oak Park & River Forest High School District 200, the Seventh Circuit confronted the same argument Plaintiffs raise here, that is, whether 34 C.F.R. § 104.35(a) compels a full evaluation prior to expulsion. 115 F.3d 1273, 1280 n.5 (7th Cir. 1997). The Seventh Circuit disagreed, holding that since the school properly determined that student's misconduct was unrelated to his learning disability, the school did not violate Section 504 by failing to preform the full reevaluation § 104.35(a) describes. Id. The Seventh Circuit concluded this point by stating that the "Rehabilitation Act should not be read to protect [the plaintiff] from the consequences of such misconduct." Id.

In this case, the School District concluded that Minor Doe's vandalism in writing racist graffiti was not caused by his disability. Consistent with the reasoning in Doe, once this determination was made, the School District was not required to complete a Section 504 evaluation prior to expelling Minor Doe.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Osseo Area School District, ISD No. 279's Motion for Summary Judgment [Docket No. 17] is **GRANTED**, and Plaintiffs Jane Doe, John Doe, and Minor Doe, by and through his Legal Guardians, Jane Doe and John Doe's Motion for Summary Judgment [Docket No. 33] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: October 31, 2017.